# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ISRAEL DISCOUNT BANK OF NEW YORK, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 9817-VCP |
| ROBERT HIGGINS and CERTIFIED ASSETS MANAGEMENT, INC., | ) ) ) ) | |
| Defendants/ Third-Party Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| REPUBLIC NATIONAL BUSINESS CREDIT LLC and NED FENTON, | ) ) ) | |
| Third-Party Defendants. | ) ) | |

## MEMORANDUM OPINION

Submitted: May 28, 2015
Decided: August 31, 2015

Joseph B. Cicero, Esq., Stephanie Habelow, Esq., CHIPMAN, BROWN, CICERO & COLE, LLP, Wilmington, Delaware; *Attorneys for Plaintiff, Israel Discount Bank of New York.*

David A. Felice, Esq., BAILEY & GLASSER, LLP, Wilmington, Delaware; *Attorneys for Defendants, Third-Party Plaintiffs, Robert Higgins and Certified Assets Management, Inc.*

Thad J. Bracegirdle, Esq., Samuel L. Moultrie, Esq., WILKS, LUKOFF & BRACEGIRDLE, LLC, Wilmington, Delaware; *Attorneys for Third-Party Defendants, Republic National Business Credit LLC and Ned Fenton.*

**PARSONS, Vice Chancellor.**

Before the Court is a motion by the third-party defendants to dismiss the amended third-party complaint under Court of Chancery Rules 9(b), 12(b)(2), and 12(b)(6).  The third-party defendants advance a litany of arguments as to why the third-party complaint should be dismissed.  For the reasons that follow, I conclude that the third-party complaint makes out a *prima facie* case for personal jurisdiction, but that it must be dismissed because key determinations in a prior case have preclusive effect and the third-party plaintiffs cannot relitigate those issues here.

## I.  BACKGROUND

In a prior decision issued May 29, 2013, *Israel Discount Bank of New York v. First State Depository Co., LLC*,[1] I determined the liability of First State Depository Co., LLC ("FSD"), and Certified Assets Management, Inc. ("CAMI"), to Israel Discount Bank ("IDB").  That case, which the parties have referred to as the "Related Action," involved the mishandling of collateral—rare coins and bullion—that secured a $10 million loan.  Ultimately, I concluded that FSD and CAMI were liable to IDB in the amount of roughly $7 million plus interest.  In addition, I held that FSD and CAMI had engaged in bad faith litigation conduct, and ordered that they pay IDB's attorneys' fees.

To understand the present motion, it is necessary to restate some of the factual background from the Related Action.  IDB is a bank.  Republic National Business Credit LLC ("Republic") is a limited liability company ("LLC") organized under the laws of California.  Republic's business included providing secured financing to facilitate the

---

[1]    2013 WL 2326875 (Del. Ch. May 29, 2013) [hereinafter "*IDB*"].

1

acquisition and distribution of precious metals and jewelry. Ned Fenton is the managing director of Republic. One of IDB's loans was a revolving credit facility it provided to Republic. In connection with that loan, IDB acquired an interest in all of Republic's collateral.

Republic, in turn, made a loan to CAMI, a Delaware corporation that offered rare coin wholesaling and marketing services. That loan was secured by certain coins and metals (generally, the "Collateral").[2] IDB had imposed upon Republic several lending restrictions, such as a $5 million cap per client. CAMI sought to evade that cap through the use of sham borrowers. Here, it is important to understand the ownership of CAMI and FSD. Robert Higgins ("Higgins"), a non-party to the Related Action and a defendant in this action, owns both FSD and CAMI. "He is FSD's sole member and CAMI's president and sole stockholder."[3] Eric Higgins, Robert's son, was the head of customer service at FSD. Steven Higgins, another son of Robert, worked at CAMI. Vicki Lott Reid, an employee of FSD and former employee of CAMI, is Higgins's sister. Donald Ketterling was a former business partner of Higgins's and employee of CAMI. After CAMI hit its borrowing cap, Ketterling and Reid entered into borrowing agreements with Republic. These were sham agreements in that essentially they pertained to loans to

---

[2]    *IDB* at \*2.

[3]    *Id.*

2

CAMI and Higgins. CAMI pledged the underlying collateral and paid the interest for both the Ketterling and Reid loans.[4]

Fenton eventually received permission from IDB to have the Collateral moved to CAMI's affiliate FSD, a Delaware LLC that serves as a private depository and provides custody, shipping, and accounting services related to precious metals. In connection with that move, several important documents were signed. FSD, Republic, CAMI, Reid, and Ketterling entered into a series of Collateral Custody Account Agreements (the "CCAAs") governing the deposit of the Collateral at FSD. Additionally, FSD, Republic, and IDB entered into a separate bailment agreement (the "Bailment Agreement") designed to protect IDB's rights in Republic's Collateral.[5] Section 6 of the Bailment Agreement provides, in pertinent part, that:

> 6. <u>Return Goods Upon Direction</u>. Until Bailee [FSD] has received written notification to the contrary from an officer of Secured Party [IDB], Bailee may continue to release the Property in accordance with instructions issued by Company [Republic]. Upon written notice from an officer of Secured Party, Bailee agrees that it will hold all such Property subject only to Secured Party's written instructions, and that Bailee will release same to Secured Party on demand, provided that Secured Party tenders to Bailee payment of any accrued charges on the Property being released.[6]

---

[4]   *Id.* at *4.

[5]   *Id.* at *3.

[6]   T-P Defs.' Opening Br. Ex. D, at 2.

3

In the Related Action, I found as a fact that, pursuant to Section 6 of the Bailment Agreement, IDB had provided written instructions to FSD in December 2009 (the "December 2009 Notice") not to release Republic's Collateral without IDB's written instructions to do so. In September 2011, FSD released the Collateral, without IDB's consent, so that CAMI could display it at coin collectibles shows. After the shows, the Collateral was not returned to FSD for storage; instead, Higgins deposited it into CAMI's safes.[7] What followed next is only tangentially relevant here, but basically involved an increasingly concerned IDB attempting to inspect the Collateral and encountering extended stonewalling by FSD. In addition, the FBI ultimately seized some of the coins FSD was holding as collateral for Republic's loans. The Related Action ensued. In April 2012, IDB obtained a consent judgment in New York, which concluded litigation it had brought against Republic, Fenton, and others. Roughly a year later, I issued the May 29, 2013 decision in the Related Action.

In the Related Action, IDB had asserted claims for breach of contract and conversion against CAMI and FSD. In the course of ruling on those claims, I made several determinations of fact that are relevant and binding here. Those factual determinations were necessary for purposes of deciding some of the large number of affirmative defenses interposed by CAMI and FSD. With respect to IDB's breach of contract claim, I found that the "December 2009 Notice and the Bailment Agreement . . .

---

[7]     *Id.* at *5.

4

limited FSD's ability to release the Collateral absent IDB's consent."[8]  Thus, I concluded that by releasing the Collateral in September 2011 without IDB's permission, FSD breached the Bailment Agreement and the obligation imposed by the December 2009 Notice.  Much as Higgins and CAMI attempt to do in this action, CAMI and FSD attempted to make the CCAAs the focus of the Related Action.  I concluded, however, that IDB's relationship with FSD was governed by the Bailment Agreement, not the CCAAs.[9]

IDB's second claim in the Related Action was for conversion against CAMI.  As one of its five defenses, CAMI argued that "Republic authorized CAMI's use of the collateral."[10]  I rejected that defense.  First, I found that "CAMI's conduct on and after September 12, 2011 . . . was not in accordance with Republic's previous authorizations for CAMI to use the Collateral to be shown at trade shows and thereafter returned to the depository."[11]  Second, I held that: "Defendants failed to prove either that Republic authorized an open-ended release or relinquishment in September 2011 or that such an authorization would have complied with the Bailment Agreement.  *Furthermore, and in*

---

[8]     *Id.* at *14.

[9]     *Id.* at *16-18.

[10]    *Id.* at *20.

[11]    *Id.* at *20.

5

*any event, the September 2012* [sic: 2011] *release had to be authorized by IDB, not just Republic.*"[12]

After obtaining the judgment against CAMI and FSD, jointly and severally, IDB brought this action on June 24, 2014, against CAMI and Higgins, primarily in an effort to attempt to recover from Higgins personally on the damages judgment IDB obtained against CAMI. Specifically, IDB's complaint seeks to pierce CAMI's corporate veil or, alternatively, hold Higgins liable for actual or constructive fraudulent transfers. CAMI and Higgins (the "Third-Party Plaintiffs") filed a third-party complaint against Republic and Fenton (the "Third-Party Defendants") on September 16, 2014. That complaint asserted counts for indemnification and contribution. After Republic and Fenton moved to dismiss, the Third-Party Plaintiffs filed an amended third-party complaint (the "Complaint"), which contains additional allegations intended to support personal jurisdiction and adds a count for fraud.

The gist of the Complaint is that Republic and Fenton owe CAMI and Higgins part or all of the final judgment amount imposed in the Related Action under theories of common law indemnification, contribution (both at common law and under 10 *Del. C.* § 6301), and fraud. The key factual allegations underlying these claims are quite similar. Under both Count I, which seeks indemnification, and Count II, which seeks contribution, the Third-Party Plaintiffs allege that "CAMI (and potentially Higgins) would not be liable to IDB for conversion or their liability would not have been as much

---

[12]     *Id.* (emphasis added).

6

as it was ultimately adjudicated to be had it not been for Republic and Fenton's conflicting, insufficient, false and misleading authorizations."[13] For the fraud claim in Count III, the Complaint alleges that these same "unfounded, insufficient, conflicting, false and misleading authorizations" were provided in an attempt "to induce CAMI to continue its conduct"[14] and that CAMI "relied on Fenton's authorizations."[15] As this overview shows, the purported authorizations by Fenton, presumably as an agent of Republic, to release the Collateral represent an essential predicate for all three Counts of the Complaint.

Fenton and Republic have moved to dismiss. Their chief argument is that all of the claims in the Complaint are barred by collateral estoppel. The Third-Party Defendants also deny that this Court has personal jurisdiction over them. Fenton is a California resident, and Republic is a California LLC. Additionally, Fenton and Republic make several ripeness arguments, and contend that the fraud claim is not pled with particularity as required by Rule 9(b).

After addressing personal jurisdiction, I turn to the Third-Party Defendants' collateral estoppel argument.

---

[13]    T-P Compl. ¶¶ 31, 34.

[14]    *Id.* ¶ 42.

[15]    *Id.* ¶ 40.

7

## II.    ANALYSIS

### A.    Personal Jurisdiction

### 1.    Applicable Standard

On a motion to dismiss under Court of Chancery Rule 12(b)(2), the claimant has the burden of showing a basis for the Court's jurisdiction over the non-resident defendant.[16] In resolving the issue of personal jurisdiction over a non-resident, Delaware courts apply a two-step analysis, determining: (1) whether a statute authorizes service of process on that defendant; and (2) whether subjecting the non-resident defendant to jurisdiction in Delaware comports with the Due Process Clause of the Fourteenth Amendment.[17] In conducting this analysis, the Court may consider the pleadings, affidavits, and any discovery of record.[18] If no evidentiary hearing has been held, as is the case here, the plaintiffs need only make a *prima facie* showing of personal jurisdiction, and are entitled to all reasonable inferences that can be drawn from the record.[19]

---

[16] *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 (Del. 2005); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *14 (Del. Ch. Aug. 26, 2005).

[17] *Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.*, 611 A.2d 476, 480 (Del. 1992).

[18] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

[19] *See id.*

## 2.      A *Prima Facie* Showing of Personal Jurisdiction Has Been Made

As noted, the Third-Party Plaintiffs must make only a *prima facie* showing of personal jurisdiction.  Although a more developed factual and legal record ultimately might show that personal jurisdiction is lacking, I conclude that the Third-Party Plaintiffs have made a *prima facie* showing that such jurisdiction exists here as to both Republic and Fenton.  Therefore, I deny their motion to dismiss to the extent it challenges jurisdiction.

### a.      There is no general jurisdiction

Higgins and CAMI argue that this Court has general personal jurisdiction over Republic and Fenton under Delaware's long-arm statute, which provides for general jurisdiction over a person that:

> Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State.[20]

This contention lacks merit.

"General jurisdiction under subsection (c)(4) requires a greater, more continuous pattern of contacts with the forum than does 'single act' jurisdiction under subsection (c)(1), (2), or (3)."[21]  Establishing general personal jurisdiction requires satisfying a significantly higher burden than is required for establishing specific personal jurisdiction.

---

[20]      10 *Del. C.* § 3104(c)(4).

[21]      *Computer People, Inc. v. Best Int'l Gp., Inc.*, 1999 WL 288119, at \*5 (Del. Ch. Apr. 27, 1999).

Indeed, the United States Supreme Court has stated that general jurisdiction requires contacts "with the State [that] are so 'continuous and systematic' as to render [the defendants] essentially at home in the forum State."[22] The facts alleged in the Complaint describe specific contacts with Delaware relating to one ongoing business relationship—*i.e.*, Republic's relationship with CAMI and its affiliates. Fenton and Republic are citizens of California. There are no allegations that either of them had current contacts with Delaware when either IDB filed its complaint or the Third-Party Plaintiffs filed their Complaint, much less the sort of "substantial and continuous activity in Delaware" that would support a finding of general jurisdiction under Section 3104(c)(4).[23] Thus, there is no basis for a finding of general personal jurisdiction over the Third-Party Defendants.

### b. A *prima facie* showing of specific jurisdiction has been made

Higgins and CAMI also argue that jurisdiction is proper under Section 3104(c)(1), (2), or (3). These sections of Delaware's long-arm statute read as follows:

> As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
> (1) Transacts any business or performs any character of work or service in the State;
> (2) Contracts to supply services or things in this State; [or]
> (3) Causes tortious injury in the State by an act or omission in this State . . . .[24]

---

[22] *Goodyear Dunlop Tires Operators, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)).

[23] *See HMG/Courtland Props., Inc. v. Gray*, 729 A.2d 300, 310 (Del. Ch. 1999).

[24] 10 *Del. C.* § 3104(c)(1)-(3).

The statute itself makes clear that the cause of action must "aris[e] from" the acts enumerated in the subsections. Transacting business in Delaware will not create personal jurisdiction for suits alleging causes of action that do not arise from the relevant Delaware-centered business transaction(s). In this instance, Fenton and Republic contend that the Third-Party Plaintiffs' causes of action do not arise from any of the contacts those Third-Party Defendants had with Delaware. Higgins and CAMI counter by arguing, among other things, that the CCAAs provide a basis for personal jurisdiction.

In my view, the dispute between the parties over jurisdiction centers on how closely the causes of action must relate to the alleged contacts with Delaware to qualify as "arising from" those contacts. Here, all of the Third-Party Plaintiffs' claims rest upon the purported authorizations Republic and Fenton gave CAMI and FSD to release the Collateral. These authorizations seem to have occurred by phone from California. The Third-Party Plaintiffs' position, however, is that those releases occurred only pursuant to the CCAAs, which were agreements that Republic entered into in Delaware for the purpose of storing collateral at FSD, a Delaware LLC physically located in Delaware. The Collateral, in fact, secured a loan from Republic to CAMI, a Delaware corporation having its principal place of business in Delaware.

The causes of action relate to the Third-Party Defendants' release authorizations, and those release authorizations relate to the business relationships that the Third-Party Defendants had with CAMI and FSD, via their loan agreements and the CCAAs, in Delaware. At this stage, the Third-Party Plaintiffs have made a sufficiently strong

11

showing that the authorizations at the heart of their claims against Republic and Fenton must be viewed within the context of the CCAAs and the actions of FSD. Those Delaware contacts are sufficient for purposes of, at least, Section 3104(c)(1), and possibly Section 3104(c)(2) as well. Fenton, as a representative of Republic, entered into loan agreements and the CCAAs with CAMI while he physically was present in Delaware. Fenton also was present in Delaware to conduct on-site inspections of the Collateral.[25] Because these actions all related to Republic's loans to CAMI and the Collateral that secured those loans, I find that they constituted the transaction of business in Delaware, as required under Section 3104(c)(1). In addition, these actions arguably also constituted "[c]ontract[ing] to supply services" in Delaware under Section 3104(c)(2), in that Republic or Fenton contracted to supply lending services to CAMI or FSD in Delaware, and provided cash to CAMI via their loan agreements.

Although the contacts in this case may be limited, the Third-Party Plaintiffs at this stage only need to make a *prima facie* showing. I conclude that they have made a *prima facie* showing of specific jurisdiction under Sections 3104(c)(1) and (2). Because that is sufficient to justify the exercise of personal jurisdiction over Republic and Fenton under Delaware's long-arm statute, I need not address whether they also have met the requirements under Section 3104(c)(3).

Furthermore, on the present record, it appears that subjecting the Third-Party Defendants to personal jurisdiction in this Court would be consistent with due process.

---

[25] T-P Pls.' Answer Br. 27-28.

12

The contacts the Third-Party Defendants have had with Delaware "relate to some act[s] by which the defendant[s] ha[ve] deliberately created obligations between [themselves] and [this] forum" and are such that Fenton and Republic "should reasonably anticipate being required to defend [themselves] in Delaware's courts."[26]  The Complaint alleges, for example, that Republic has received millions of dollars in interest income from the loans it has made to CAMI and its affiliated entities in Delaware.  Thus, the Third-Party Plaintiffs have made a sufficient showing to defeat Republic and Fenton's motion to dismiss for lack of personal jurisdiction.

### B.    Collateral Estoppel

Having concluded that the Third-Party Plaintiffs have made out a *prima facie* case for personal jurisdiction, I turn to their collateral estoppel defense.  Higgins and CAMI dispute all three elements of the collateral estoppel test.  In addition, Higgins argues that, because he was not a party to the Related Action, he is not bound by it even if collateral estoppel applies to CAMI.  Taking these arguments in turn, I conclude first that collateral estoppel bars CAMI from asserting all three of the Counts in the Complaint.  Second, because I find that Higgins is in privity with CAMI, I conclude that he, too, is barred from pursuing the relief sought in the Complaint.

---

[26]    *Albert*, 2005 WL 2130607, at *15 & n.70 (citing *AeroGlobal Capital Mgmt.*, 871 A.2d at 440; *Int'l Shoe Co.,* 326 U.S. at 316).

### 1. Standard of Review

The Third-Party Defendants have moved to dismiss based on collateral estoppel under Rule 12(b)(6). Pursuant to Rule 12(b)(6), this Court may grant a motion to dismiss for failure to state a claim if a complaint does not assert sufficient facts that, if proven, would entitle the plaintiff to relief. "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[27] That is, when considering such a motion, a court must "accept all well-pleaded factual allegations in the Complaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[28] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[29]

### 2. The Elements of Collateral Estoppel Are Satisfied

"Collateral estoppel, also known as issue preclusion, prevents a party who litigated an issue in one forum from later relitigating that issue in another forum."[30] "Collateral estoppel applies if: (1) the same issue is presented in both actions; (2) the issue was

---

[27] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (footnote omitted).

[28] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[29] *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[30] *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, 2014 WL 5509787, at *11 (Del. Ch. Oct. 31, 2014).

litigated and decided in the first action; and (3) the determination was essential to the prior judgment."[31] "The defendant in the second lawsuit may properly assert the defense of collateral estoppel to prevent the plaintiff from litigating issues that the plaintiff previously litigated and lost, even though the defendant himself was not a party to the first proceeding."[32]

The Third-Party Plaintiffs contend that the "material issue raised in the [Complaint] is whether Republic and Fenton's authorizations were conflicting, insufficient, false or misleading when measured against their duties and obligations arising under the CCAA and common law."[33] By contrast, they assert that the issue presented in the Related Action was whether "CAMI could be held liable for conversion if Republic and Fenton authorized the Collateral's release 'including removing it from the depository, marking it for sale, and selling it.'"[34]

It is difficult to comprehend Higgins and CAMI's argument that the Related Action did not address the same issue. The decision in the Related Action includes a subsection that explicitly addresses the issue of "Republic's authorization of CAMI's use of the collateral."[35] That portion of the opinion discussed CAMI's assertion that

---

[31]   *Zutrau v. Jansing*, 2014 WL 3772859, at *41 (Del. Ch. July 31, 2014), *aff'd*, __ WL __ (Del. Aug. 26, 2015).

[32]   *Sanders v. Malik*, 711 A.2d 32, 34 (Del. 1998).

[33]   T-P Pls.' Answering Br. 15.

[34]   *Id.* (quoting *IDB* at *20).

[35]   *IDB* at *20.

"Republic authorized CAMI's use of the Collateral" and that its authorization constituted a defense to IDB's conversion claim. In rejecting that defense, I found that the evidence showed that "CAMI's conduct . . . was not in accordance with Republic's previous authorizations for CAMI to use the Collateral to be shown at trade shows."[36] In addition, I held that the "Defendants [FSD and CAMI] failed to prove either that Republic authorized an open-ended release or relinquishment in September 2011 or that such an authorization and release would have complied with the Bailment Agreement."[37]

Here, CAMI and Higgins allege that they would not be liable to IDB for conversion or would not be liable to the same extent "had it not been for Republic and Fenton's conflicting, insufficient, false and misleading authorizations."[38] I squarely addressed the issue of whether Republic authorized FSD and CAMI to release the Collateral in the Related Action. The factual findings described above were pivotal to my rejection of CAMI's "Republic consented" defense to conversion. That issue was litigated and decided in the Related Action; indeed, CAMI raised Republic's alleged authorizations as an affirmative defense there. In addition, those determinations were

---

[36]    *Id.*

[37]    *Id.*

[38]    T-P Compl. ¶¶ 31, 34. The non-specific terms by which the Third-Party Plaintiffs describe the authorizations challenged in this action are repeated several times in the Complaint. On other occasions, the Third-Party Plaintiffs also have characterized the disputed authorizations as "unfounded." T-P Compl. ¶¶ 13, 38, 40, 41-43. All of these terms are general in nature and vague, and the lack of specificity makes it more difficult to analyze the Third-Party Plaintiffs' claims.

16

necessary to the prior ruling. Had I concluded otherwise and found that Republic's authorizations did provide an affirmative defense, CAMI might not have been found liable for conversion or might not have been liable in the same amount.

CAMI and Higgins argue that these determinations were not essential because the *IDB* opinion "only found that the authorizations had no place in a dispute involving rights derived from the Bailment Agreement and December 2009 Notice."[39] This argument reveals the fallacy of the Complaint's indemnification and contribution claims. CAMI and Higgins suggest that this Court must decide the parties' respective rights under the CCAAs because those rights exist independently of the Bailment Agreement. According to the Complaint, Republic and Fenton gave authorizations under the CCAAs and, but for those authorizations, Higgins and CAMI would not have been liable for conversion. But that argument is inconsistent with the holdings and findings I made in the Related Action.

Admittedly, the Related Action focused on the Bailment Agreement and the December 2009 Notice. At the conclusion of the discussion of Republic's consent, however, I held: "Furthermore, and in any event, the September 2012 [sic: 2011] release had to be authorized by IDB, not just by Republic."[40] The opinion in the Related Action discussed repeatedly the fact that IDB's consent was required, and that Higgins, CAMI, and FSD all knew it was required. That is, notwithstanding the CCAAs, IDB's consent was necessary in order to release the Collateral. Absent IDB's consent, CAMI was liable

---

[39] T-P Pls.' Answering Br. 18.

[40] *IDB* at *20.

for conversion regardless of whether, separately under the CCAAs, Republic or Fenton had authorized CAMI or FSD to release the Collateral. Nevertheless, CAMI and Higgins assert in this action that, but for Republic and Fenton's authorizations, they would not have been liable or would not have been liable to the same extent. This is incorrect. CAMI was held liable for conversion because it released the Collateral without IDB's consent. Thus, even assuming the general factual allegations in the Complaint regarding the authorizations are true, those authorizations are immaterial. No matter how many unfounded, conflicting, insufficient, false or misleading authorizations Republic and Fenton may or may not have issued, none of those authorizations would have changed the fact that IDB's consent was required to release the Collateral, and its consent was not given. I also note that the Complaint does not allege that Republic or Fenton ever represented to CAMI or Higgins: (1) that IDB had provided its consent; or (2) that IDB's consent was not necessary.[41]

---

[41] Based on the findings in the Related Action, such an allegation necessarily would include at least an implicit assertion that Republic or Fenton made false, fraudulent, or mistaken statements regarding IDB's consent. Under Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Ct. Ch. R. 9(b). The Complaint, however, contains no such specific allegations regarding any explicit authorization. Indeed, the Complaint fails to meet the more relaxed pleading standards under Rule 8 because it fails to give the Third-Party Defendants fair notice of any allegation that Republic or Fenton ever expressly had advised either CAMI or FSD that IDB had given its consent, or that such consent was unnecessary.

18

### a. The indemnification and contribution claims

Indemnification and contribution are derivative causes of action, in that there cannot be liability under these causes of action by Party C to Party B until Party B is found liable and pays money to Party A. In the Related Action, CAMI was found liable to IDB for conversion. That liability was based on a breach of the Bailment Agreement and the December 2009 Notice. CAMI now seeks indemnification and contribution from Republic and Fenton on the grounds that their authorizations—purportedly under the CCAAs—caused the liability. In the Related Action, however, I held that whether those authorizations were given or not had no effect on CAMI's liability. Thus, based on the findings in the Related Action—findings that are binding here because of collateral estoppel—I hold that Counts I and II of the Complaint are based upon a logically flawed premise and therefore are legally deficient.

In the Related Action, I held that CAMI's behavior exceeded Republic's authorizations. Furthermore, and more importantly, I found that IDB's consent was required before the Collateral could be released, and that Higgins, FSD, and CAMI knew it. CAMI's liability for conversion therefore was based on the failure to obtain IDB's consent. Those findings have collateral estoppel effect here. Accordingly, the Complaint's indemnification and contribution counts fail to state a claim.

### b. The fraud claim

The fraud claim is barred by collateral estoppel as well. According to the Complaint, the Third-Party Plaintiffs' claim for fraud also stems from the same

"unfounded, insufficient, conflicting, false and misleading" authorizations given by Republic and Fenton.[42] Fraud has five elements:

> (1) a false representation of material fact; (2) the defendant's knowledge of or belief as to the falsity of the representation or the defendant's reckless indifference to the truth of the representation; (3) the defendant's intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damages to the plaintiff as a result of such reliance.[43]

As to the first two elements, the Complaint either lacks specificity, and, therefore, fails to meet the pleading requirements of Rule 9(b), or the alleged authorizations are so general that the Third-Party Plaintiffs could not meet the justifiable reliance requirement in the fourth element for proving fraud. Because there does not appear to be any dispute that the third and fifth elements probably are satisfied, I need not discuss them further.

In terms of "a false representation of a material fact," the Complaint only alleges that "Fenton's authorizations were statements of fact that he had the right and authority to authorize the release of collateral."[44] The Third-Party Plaintiffs also claim that the second element is satisfied because "Fenton knew or should have known that his authorizations were unfounded, insufficient, conflicting, false and potentially misleading to CAMI (as it relied upon the CCAA) because Republic and Fenton were aware of

---

[42] T-P Compl. ¶ 42.

[43] *CSH Theatres, LLC v. Nederlander of S.F. Assocs.*, 2015 WL 1839684, at \*21 (Del. Ch. Apr. 21, 2015) (internal quotations omitted).

[44] T-P Compl. ¶ 37.

IDB's position that no collateral could be released without its approval . . . ."[45]  Viewing this allegation in the light most favorable to the Third-Party Plaintiffs, it might mean that Republic and Fenton *implicitly* suggested that they either: (1) had already secured IDB's authorization for the release; or (2) had concluded that their authorization was independently sufficient to release the Collateral.  The Third-Party Plaintiffs do not allege anywhere in the Complaint that Fenton explicitly represented that he had secured IDB's authorization for the release or that IDB's authorization was unnecessary.  Thus, the Third-Party Plaintiffs are asserting, at most, that Fenton's authorizations were false because he implied that his was the only authorization needed.  Assuming that allegation is true, however, the question remains whether the Third-Party Plaintiffs justifiably could have relied on such a false representation.

On the issue of reliance, the Third-Party Defendants first assert that there is an open question whether there could have been any reliance on the alleged authorizations by CAMI and Higgins because the authorizations were given to FSD, not CAMI or Higgins.[46]  This argument is unpersuasive because I held in the Related Action that FSD had a close relationship to CAMI, and that Higgins controlled the actions of both FSD and CAMI.[47]

---

[45]     T-P Compl. ¶ 38.

[46]     T-P Defs.' Opening Br. 32.

[47]     *IDB* at *2, *19.

21

Even assuming that CAMI and Higgins could prove reliance, however, they cannot show *justifiable* reliance. In the Related Action, I concluded from the evidence presented that the "most reasonable inference" was that "FSD received the December 2009 Notice and that it was shown to at least Higgins. . . . The December 2009 Notice and the Bailment Agreement, therefore, limited FSD's ability to release the Collateral absent IDB's consent."[48] This finding was bolstered by an earlier finding that, on at least one occasion, FSD had conformed its conduct to the requirement of needing IDB's consent to release the Collateral.[49] I also found that "the evidence show[ed] that Higgins controlled the actions of both FSD and CAMI as they relate[d] to the Collateral at all relevant times . . . ."[50] Furthermore, these findings were necessary to my conclusion that CAMI had converted IDB's property.

Based on the factual findings in the Related Action, CAMI and FSD needed IDB's consent to release the Collateral. Here, I conclude as a matter of law that it was not reasonable or justifiable for CAMI or Higgins to rely on Republic and Fenton's authorizations, even if they assumed those authorizations meant Republic and Fenton considered theirs to be the only authorization necessary, because CAMI and Higgins

---

[48]   *IDB* at *14.

[49]   *Id.* at *5.

[50]   *Id.* at *19.

22

knew that such authorizations were insufficient without IDB's permission.[51]  Thus, the fraud claim also is barred by collateral estoppel.

### 3.        Higgins is in Privity with CAMI

The above holdings apply to CAMI because it was a party in the Related Action.  I conclude that Higgins is in privity with CAMI and that the same holdings apply to him. Therefore, Higgins's claims are barred by collateral estoppel as well.

As noted, collateral estoppel can be applied against a plaintiff even though the defendant was not a party to the original action.[52]  In this instance, there is an additional twist in that Fenton and Republic, non-parties to the Related Action, seek to prevent Higgins, a non-party to the Related Action, from relitigating issues that CAMI litigated there.  In these circumstances, the question is whether Higgins is barred by collateral estoppel from re-litigating those issues, and that depends upon whether Higgins is in privity with CAMI such that it is fair and equitable to bind him to the determinations in the Related Actions.

The relevant case law strongly supports the conclusion that Higgins was in privity with CAMI for purposes of issue preclusion.[53]

---

[51]     *See Ward v. Hildebrand*, 1996 WL 422336, at \*4 (Del. Ch. July 8, 1996) ("[T]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or if its falsity is obvious to him.").

[52]     *Sanders*, 711 A.2d at 34.

[53]     Indeed, the same facts and arguments support a conclusion that Higgins also is in privity with FSD, the other defendant in the Related Action.

23

> Privity is a legal determination for the trial court with regard to whether the relationship between the parties is sufficiently close to support preclusion. . . . The term privity signifies that the relationship between two or more persons is such that a judgment involving one of them may justly be conclusive on the others, although those others were not party to the lawsuit.[54]

A recent case by Vice Chancellor Noble, *Grunstein v. Silva*,[55] addressed the issue of privity at some length. There, the Court surveyed the case law and concluded that the simplest "test for privity is whether there is a close or significant relationship" between the relevant entities or persons.[56] Important factors in making the privity determination include "whether their interests were aligned," whether it would be just that the finding would be conclusive on the non-party, and whether there is substantial identity between otherwise superficially separate parties.[57]

Other cases suggest that privity practically is assumed for sole-owner corporations. In *Orange Bowl Corp. v. Jones*,[58] the Superior Court found a wholly owned corporation in privity with the individual defendants.[59] In that case, the individual

---

[54] *Higgins v. Walls*, 901 A.2d 122, 138 (Del. Super. 2005) (footnotes omitted) (quoting 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE 132.04[1][b] (3d ed. 2004) (quotation marks omitted)).

[55] 2014 WL 4473641 (Del. Ch. Sept. 5, 2014).

[56] *Id.* at *42.

[57] *Id.* (citing *Orloff v. Shulman*, 2005 WL 3272355, at *5 (Del. Ch. Nov. 23, 2005)).

[58] 1986 WL 13095 (Del. Super. Oct. 16, 1986).

[59] *Id.* at *3 (citing *In re Gottheiner*, 703 F.2d 1136, 1139 (9th Cir. 1983); *Martino v. McDonald's Sys., Inc.*, 598 F.2d 1079, 1083 n.7 (7th Cir. 1979)).

defendants, who were family members, owned all of the shares of the corporation, acted as its directors and officers, and exercised control over its day-to-day affairs. The Court accordingly concluded that there was "no factual or legal dispute that a sufficient commonality of interest exists between the [individual defendants] and [the corporation] for the bar of collateral estoppel to apply."[60]

Here, Higgins is "CAMI's president and sole stockholder."[61] The evidence in the Related Action supported the conclusion that he controlled both CAMI and FSD. His interests were aligned with the interests of those entities. Indeed, in the Related Action, I found that "FSD engaged in a corporate shell game whereby Higgins, as the common owner of FSD and CAMI, abused the corporate form to avoid the technical requirements of the Bailment Agreement and the other relevant agreements."[62] Because Higgins controlled CAMI and had a strong, if not complete, commonality of interest with CAMI, there is nothing remotely unjust about making the factual findings in the Related Action applicable to him, as well as CAMI. Accordingly, based on the findings in the Related Action and the factors considered by Delaware courts in determining whether privity exists, I conclude that Higgins is in privity with CAMI. Collateral estoppel, therefore,

---

[60] *Id.* at \*3 n.1; *see also Restatement (Second) of Judgments* § 59(3) (1982) ("If the corporation is closely held, in that one or a few persons hold substantially the entire ownership in it, the judgment in an action by or against the corporation or the holder of ownership in it is conclusive upon the other of them as to issues determined therein . . . .").

[61] *IDB* at \*2.

[62] *Id.* at \*15.

25

applies to Higgins as well, and prevents him from relitigating the issues decided in the Related Action.

## III. CONCLUSION

For the reasons stated in this Memorandum Opinion, I deny the Third-Party Defendants' motion to dismiss the Complaint under Rule 12(b)(2) for lack of personal jurisdiction over them. I grant the motion to dismiss under Rules 9(b) and 12(b)(6) on the ground that all of the Counts in the Complaint are barred by collateral estoppel,[63] and therefore dismiss the Complaint with prejudice.[64] Each party shall bear its own attorneys' fees and expenses.

**IT IS SO ORDERED.**

---

[63] Higgins and CAMI have suggested that there is a fourth element to collateral estoppel, to wit: whether the party against whom the doctrine is asserted had a "'full and fair opportunity to litigate the issue in the prior action.'" *Betts v. Townsends, Inc.*, 765 A.2d 531, 535 (Del. 2000) (quoting *State v. Machin*, 642 A.2d 1235, 1239 (Del. Super. 1993)). Even assuming such a fourth element does exist, it does not alter my analysis. CAMI and FSD, both of which are wholly owned and controlled by Higgins, furiously litigated the Related Action. In addition, FSD asserted at least six defenses to the breach of contract claim, and CAMI asserted at least five defenses to the conversion count and contested many of the underlying elements of IDB's claims. Finally, although he was not a party to the Related Action, Higgins directly participated in the litigation by "provid[ing] almost nine hours of deposition testimony." *IDB* at *30. Thus, I conclude that CAMI and, by association, Higgins, did have a full and fair opportunity to litigate the relevant findings in the Related Action.

[64] Based on my ruling as to collateral estoppel, I have not addressed the other grounds advanced for dismissal under Rule 12(b)(6).

26